UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
VICTOR FUENTES,

                 Plaintiff,                  **MEMORANDUM AND ORDER**
                                             14-CV-32 (RRM) (CLP)

        -against-

CABLEVISION SYSTEMS CORPORATION,

                 Defendant.
--------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

       Plaintiff Victor Fuentes commenced this action against defendant Cablevision Systems

Corporation ("Cablevision"), alleging (i) race, color, and ethnicity discrimination in violation of

42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. L. § 290 *et seq*., and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code § 8-101 *et seq*.; (ii) sex and gender discrimination in violation of NYSHRL and

NYCHRL; and (iii) violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C.

§ 2601 *et seq*, including retaliation[1] and interference.[2]  (Am. Compl. (Doc. No. 6).)  Before the

Court are Cablevision's motion for summary judgment on all claims, and Fuentes' motion for

partial summary judgment on his claim that Cablevision interfered with his rights under the

FMLA.  (Def.'s Mot. for Summ. J. (Doc. No. 44); Pl.'s Mot for Partial Summ. J. (Doc. No. 58).)

For the reasons discussed below, Cablevision's motion is granted in part and denied in part and

Fuentes' motion is denied.  Fuentes' FMLA claims shall proceed; his federal and state claims

---

[1] Fuentes' amended complaint alleges retaliation, discrimination, and interference pursuant to the FMLA, however, Fuentes acknowledges in his submissions that a discrimination and retaliation claim under the FMLA are one in the same.  (Pl.'s Mem. L. Supp. Pl.'s Mot. for Partial Summ. J. ("Pl.'s Summ. J. Mot.") (Doc. No. 62) at 5.)

[2] Fuentes voluntarily withdrew his retaliation claims under the NYSHRL, the NYCHRL, and Section 1981 – Counts 2, 4, 6, 8, and 13.  (*See* Pl.'s 5/3/15 Ltr. (Doc. No. 37); Def.'s 9/16/15 Ltr. (Doc. No. 38); Def.'s Mem. L Supp. Mot. for Summ. J. ("Def.'s Summ. J. Mot.") (Doc. No. 45) at 8 n.1.)

alleging race and gender discrimination are dismissed.

BACKGROUND[3]

Cablevision is a corporation that provides, among other things, television, phone, and internet services to residential and business customers in the New York metropolitan area. (Def.'s 56.1 Stmt. & Responses (Doc. No. 53) ¶ 2.)  In 2011, Fuentes, an African-American male of Hispanic descent, was interviewed for a position at Cablevision by Pedro Checo, a Dominican male of Hispanic decent, who recommended that Cablevision hire Fuentes.[4]  (Id. ¶¶ 4, 5; Hoey Decl., Ex. C ("Checo Tr.") (Doc. No. 46-3) 113:12–22.)  Fuentes was hired in October 2011 to work as an Inbound Retention Representative ("IRR") in Cablevision's Bronx, New York call center.  (Def.'s 56.1 Stmt. & Responses ¶¶ 1, 3.)  As an IRR, Fuentes' job was to answer inbound calls from Cablevision customers who wanted to cancel or downgrade service and to try to "save" the account by convincing the customers to maintain or increase their service.  (Id. ¶ 27.)   In this regard, Fuentes was trained on a number of different strategies such as: comparing Cablevision products and prices to those of competitors, offering the customer a special incentive, offering the customer a promotion or an account credit, and offering the customer discounted rates.  (Id. ¶ 31.)

In late January 2013, Checo made the decision to terminate Fuentes' employment.  (Id. ¶ 6;[5] see also Checo Tr. at 120:25–121:5.)  At the time of Fuentes' termination, there were ninety-seven IRRs working at the Bronx call center and forty-three self-identified as Hispanic, six as Caucasian, forty-three as African-American, and five as "Two or More Ethnicities."[6] (Def.'s 56.1 Stmt. & Responses ¶ 7; Roman 10/30/15 Aff. (Doc. No. 47) ¶¶ 5, 6.)  Thus, over 88% of the IRRs employed in the Bronx call center in March 2013 self-identified as either

---

[3] The following facts – drawn from the parties' Local Rule 56.1 statements and the submissions filed in connection with these motions – are undisputed unless otherwise noted.

Hispanic or African American.

IRRs are split into teams and directly supervised by Retention Supervisors.  (Def.'s 56.1 Stmt. & Responses ¶ 8.)  From June 2012 until his termination, Fuentes was supervised directly by Retention Supervisor Osei Jeremiah, who self-identifies as a black man of West Indian origin. (*Id.* ¶ 9; Jeremiah 1/14/16 Aff. (Doc. No. 56) ¶ 1.)  Jeremiah, who reported to Checo, was responsible for supervising a small team of IRRs, as well as coaching, training, and developing employees.  (Def.'s 56.1 Stmt. & Responses ¶ 10.)  It is undisputed that neither Jeremiah nor Checo ever made disparaging remarks about Fuentes' race or ethnicity.  (*Id.* ¶ 12.)

On January 9, 2013, Fuentes' wife had a baby.  (*Id.* ¶ 13.)  Neither Jeremiah nor Checo made any negative comments regarding the birth of Fuentes' daughter and, upon learning the news, both congratulated Fuentes.  (*Id.* ¶¶ 14–15.)  From January 23 through January 28, 2013, Fuentes took a week of FMLA bonding leave, approved by Cablevision, and returned to work on January 30.  (*Id.* ¶¶ 17, 113–14.)

Eligible employees at Cablevision are entitled to 12 weeks of FMLA bonding leave, to be taken in one single block or in one week increments.  (*Id.* ¶ 94.)  Jacqueline Nunez, who self-

---

[4] Cablevision alleges that Checo approved Fuentes' hiring.  (Def.'s 56.1 Stmt. & Responses ¶ 4.)  Fuentes disputes this fact asserting that Checo was not a manager at the time Fuentes was hired and did not make the hiring decision. (*Id.*)  Checo's testimony supports Fuentes' assertion that Checo did not have hiring authority, but rather Checo recommended that Fuentes be hired.  (Checo Tr. at 113:12–22.)

[5] Fuentes disputes the assertion that Checo made the decision in late January 2013 to terminate Fuentes *because* he mishandled a number of customer calls, but does not dispute the fact of the decision itself.  (Def.'s 56.1 Stmt. & Responses ¶ 6.)

[6] Fuentes challenges this fact on that basis that Serena Roman is not competent to testify as to the racial and ethnic makeup of the Bronx call center, (Def.'s 56.1 Stmt. & Responses ¶ 7), however, Roman identifies herself in her affidavit as the Human Resources Manager at Cablevision and states that she has access to personnel information of Cablevision's past and current employees.  (Roman 10/30/15 Aff. ¶¶ 2–3.)  Such testimony is admissible.  *See Danone Asia Pte. v. Happy Dragon Wholesale, Inc.*, No. 05-CV-1611 (CPS), 2006 WL 845573, at *4 n.3 (E.D.N.Y. Mar. 29, 2006) (finding that an officer of a company may provide statements in affidavits based on personal knowledge and from review of company records, both of which are admissible).  Accordingly, the Court accepts Roman's testimony regarding the racial and ethnic make-up of the call center where Fuentes' only objection is based on her alleged lack of competence to testify to such facts.

identifies as Hispanic/Latino and worked at Cablevision as a Disability Analyst, administered FMLA leave for IRRs in the Bronx call center.  (*Id.* ¶¶ 88–89.)  Nunez would determine an employees' eligibility to take FMLA leave and, if the employee was eligible, Nunez would meet with him or her to discuss the leave available and begin to process the FMLA request form and paperwork.  (*Id.* ¶¶ 90–91.)  Male employees were not eligible for FMLA leave until after their child was born and Nunez would instruct male employees to contact her at the time of birth.  (*Id.* ¶ 95.)  When an employee was approved for FMLA leave, Nunez would notify the appropriate supervisor and manager via email.  (*Id.* ¶ 97.)  She also prepared weekly FMLA tracking spreadsheets, including one for the week ending January 26, 2013, when Fuentes was on leave.  (*Id.* ¶ 98.)  Neither Jeremiah nor Checo ever made any negative comments about the fact that Fuentes took FMLA bonding leave following his daughter's birth, and they, and the entire HR department, congratulated Fuentes on the birth.  (*Id.* ¶¶ 18, 106.)

On January 30, 2013, after his return from his first week of FMLA leave, Fuentes met with Jeremiah to review several calls, including six allegedly mishandled calls.  (*Id.* ¶ 65.)  Jeremiah and Fuentes also discussed "how bad" the month of January was in terms of Fuentes' performance and the need for Fuentes to improve.  (*Id.* ¶ 68.)  Fuentes acknowledged that he had a bad month in January and told co-workers that he anticipated that he would be disciplined for that reason.  (*Id.* ¶ 70.)  After the January 30 meeting, Jeremiah met with Checo to discuss the calls.  (*Id.* ¶¶ 72–73.)

At some point on or before January 31, 2013, Checo made the decision to terminate Fuentes, and Serena Roman of the Human Resources ("HR") Department, an African American, subsequently reviewed the decision to determine whether it was in accordance with appropriate procedure.  (*Id.* ¶ 25.)  On January 31, 2013, the initial draft of a termination request was

prepared.  (*Id.* ¶ 24; Hoey Decl., Ex. J ("1/31/13 Termination Request") (Doc. No. 46-10).)[7]  On

February 2, 2013, Checo emailed the termination request to Roman in HR.  (Def.'s 56.1 Stmt. &

Responses ¶ 77.)  Emailing such requests to HR is how Cablevision initiates a termination of an

employee, a process that can take several weeks or even months depending on the information

that needs to be gathered and reviewed and the approvals that need to be obtained.  (*Id.* ¶¶ 78,

80.)  Roman requested recordings of the calls in question in order to listen to them herself before

approving the termination, though Fuentes was not yet informed of his pending termination.  (*Id.*

¶¶ 81–82.)  Technical issues relating to the encryption of the recordings delayed the process and

it was not until February 25, 2013 that Roman approved Fuentes' termination.  (*Id.* ¶¶ 82–83.)

On February 25, 2013, the termination request was submitted "with the approval of

Robert Scuteri, VP and Pedro Checo, Manager."  (*Id.* ¶ 26; Hoey Decl., Ex. K ("2/25/13

Termination Request") (Doc. No. 46-11).)  The request noted that the termination was prepared

by Roman; that Fuentes' last performance evaluation was: "Achieved Expected Performance";

and "Prior Corrective Action: 8/17/12 – Verbal warning to File – Performance."  (2/25/13

Termination Request at 2.)  It also included a "Summary" section that stated: "Based on Victor's

unsatisfactory sales performance and failure to comply with department policy, termination is

recommended."  (*Id.*)  The request further included a "Description" section that stated: "During

normal call observations, Victor's supervisor listened to six calls where Victor failed to attempt

to save or upgrade customers."  (*Id.*)

The parties dispute whether such save attempts were required on all calls.  According to

Cablevision's "CUSTOMER CARE POLICIES (SIMPLIFIED)," employees "must make save

---

[7] The draft termination request states that the "date submitted" is January 31, 2012, but the body of the memo
references events occurring in 2013, demonstrating that the date at the top of the draft was erroneously noted as
2012 rather than 2013.  (1/31/13 Termination Request.)  Similarly, Checo testified during his deposition that the
decision to terminate Fuentes was made in January 2012.  (Checo Tr. at 119:2–3.)  This too is presumably an error.
The parties do not seem to dispute that the decision to terminate and actual termination occurred in early 2013.

attempts on every call" and "[a]ttempts to up-sale should be made on all calls."  (Hoey Decl., Ex. M ("Customer Care Policies") at 2.)  Checo testified that this Customer Care Policy was "a way of reminding the reps again of the procedures that they should be following when taking calls." (Checo Tr. at 78:11–13; Customer Care Policies.)  However, IRRs were not required to sign the Customer Care Policies because it was "just a reminder."  (Checo Tr. at 80:25–81:8.)

Fuentes disputes that this document constitutes Cablevision's official policies.  (Def.'s 56.1 Stmt. & Responses ¶¶ 28–29.)  He asserts that the document was created by Checo and other mangers and that it does not fully and accurately represent Cablevision's official policies. (*Id.*)  Fuentes does not dispute that failing to make a save attempt or an up-sale attempt when a customer called to disconnect his or her account would be a violation of Cablevision's call handling policies and procedures.  (*Id.* ¶ 34.)  However, Fuentes alleges that, when a customer had already disconnected and was calling to follow up on where to return equipment or make a similar inquiry, IRRs had been told not to use limited time to "save" customers that had already been lost.  (*Id.* ¶ 30; Parkhurst Decl., Ex. B ("Fuentes Tr. II") (Doc. No. 52-2) 418:13–20.)  Of the six calls Fuentes is alleged to have mishandled, Fuentes asserts that four involved already disconnected customers and thus did not require save attempts.  (Fuentes 12/10/15 Decl. (Doc. No. 51) ¶ 13–15.)  He further asserts that on one of the other two calls, he did in fact make a save attempt.  (*Id.* ¶ 15.)

The parties also dispute whether Fuentes requested a second week of FMLA leave. Fuentes alleges that, on February 27, 2013, he spoke with Nunez outside of the call center and that Nunez instructed him to call HR the day before any requested FMLA leave to get approval. (Def.'s 56.1 Stmt. & Responses ¶¶ 13, 88–89, 120, 122.)  He further asserts that he called Persad, a Human Resources Coordinator, on February 28, 2013 to confirm that he was taking February

29 through March 7, 2013 as FMLA leave.  (*Id.* ¶ 14.)  Fuentes has provided Verizon Wireless

call records supporting his assertion that he placed calls to HR on February 28.  (Fuentes

10/30/15 Decl., Ex. B ("Call Records") (Doc. No. 60-2) at 4.)

Cablevision claims to have no record of Fuentes' alleged request for leave and asserts

that Nunez was terminated on February 27, 2013 at approximately 9:30 a.m.  (Def.'s 56.1 Stmt.

& Responses ¶¶ 121, 133.)  Cablevision states that Nunez left the Cablevision premises by 10:30

a.m. and it is undisputed that Fuentes did not arrive at the call center until 12:15 p.m. that day.

(*Id.* ¶ 122–23.)  Accordingly, Cablevision claims that Fuentes could not have spoken with Nunez

on February 27, 2013 to request a second week of FMLA leave.  (*Id.* ¶ 124.)  Nunez does not

recall Fuentes making a second request for FMLA leave.  (*Id.* ¶ 125.)

Fuentes was scheduled to work on February 28, and March 1, 2, 4, and 6, 2013, but did

not report to work or call to inform his supervisor or manager that he would be absent.  (*Id.*

¶¶ 134–36.)  Roman sent Fuentes a letter requesting that he contact Cablevision by March 8,

2013 to explain his absence.[8]  (*Id.* ¶ 137.)

Fuentes called on March 5, 2013 and spoke with Persad.  (*Id.* ¶ 138.)  He informed

Persad that he was out on FMLA leave through March 6.  (*Id.* ¶ 139.)  Cablevision asserts that

Persad informed Fuentes, after consulting with Roman, that there was no record of Fuentes being

approved for a second week of FMLA leave and it is undisputed that Persad directed Fuentes to

report back to work the next day – March 6, 2013.  (*Id.* ¶¶ 140–41.)

Fuentes complied and returned to work on March 6, 2013.  (*Id.* ¶ 142.)  He worked for

approximately three hours that morning and was terminated later that day during a meeting with

Checo and Roman.  (Pl.'s 56.1 Stmt. & Responses ¶¶ 21–22; Def.'s 56.1 Stmt. & Responses

---

[8] The letter is dated February 4, 2013.  (Hoey Decl., Ex. BB ("Ltr. Re Job Abandonment") (Doc. No. 46-28).)

¶ 147.)  Roman informed Fuentes that he was being terminated because he mishandled calls in January 2013 and she also discussed possible job abandonment based on his failure to report to work during the week Fuentes alleges he was on FMLA leave.  (Def.'s 56.1 Stmt. & Reponses ¶ 148; Roman Tr. II (Doc. No. 52-5) at 71:10–72:16.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial, summary judgment is

8

warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

DISCUSSION

I.   Discrimination Claims

Fuentes brings claims of race, color, and ethnicity discrimination under Section 1981, NYSHRL, and NYCHRL, and claims of sex and gender discrimination under NYSHRL and NYCHRL.  (*See* Compl.)  The same analytic framework is necessary to support Fuentes' Section 1981 and NYSHRL claims.  *Davis v. Oyster Bay-E.*, No. 03-CV-1372 (SJF), 2006 WL 657038, at *8 n.12 (E.D.N.Y. Mar. 9, 2006) (analyzing plaintiff's racial discrimination claims under Section 1981 and the NYSHRL together "as the same analytic framework applies to each").  Accordingly, the Court analyzes these two claims together.

a.   Section 1981 & NYSHRL

In analyzing Section 1981 and NYSHRL claims, the Court must apply the three-part burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Barella v. Village of Freeport*, 16 F. Supp. 3d 144, 158 (E.D.N.Y. 2014) ("[C]laims under Section . . . 1981[ ] and the NYSHRL are . . . evaluated according to the three-step burden-shifting framework set forth in *McDonnell*." (internal quotation marks omitted) (collecting cases)).  Pursuant to that analysis, in the absence of direct evidence of employment

9

discrimination, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000).  This burden is minimal and does not require specific evidence of discrimination.  *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006).  If a plaintiff meets this burden, the defendant employer must then, articulate a "legitimate, nondiscriminatory reason" for the adverse employment action.  *McDonnell Douglas,* 411 U.S. at 802.  Upon such showing, a plaintiff must then provide evidence that the employer's explanation is merely a pretext for discrimination.  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001).

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252 (1981).  It is not enough for a plaintiff merely to create doubt that the defendant's stated reason was the real reason for discharging him.  He must also put forth "evidence that would permit a rational factfinder to infer that the discharge was actually motivated . . . by discrimination" on the basis of his protected status.  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997).

The Second Circuit has emphasized "the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d. Cir. 2008).  District courts must remain mindful that, "[w]here an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that affidavits and depositions must be

10

carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* (internal citations and quotation marks omitted).  However, while courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  And, although district courts must pay careful attention to affidavits and depositions that may reveal circumstantial proof of discrimination, *see Holcomb*, 521 F.3d at 137, courts are not to "treat discrimination differently" from other types of cases on summary judgment, *Abdu–Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Thus, although it is difficult for courts to ascertain discriminatory intent, courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999).  Even in discrimination cases, therefore, a plaintiff must provide more than conclusory allegations to defeat a motion for summary judgment, *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (collecting cases), as "[s]ummary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact," *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) (collecting cases).

### i.  Prima Facie Showing

To establish a *prima* facie showing of discrimination, a plaintiff must provide facts supporting a finding that an adverse action occurred because of a protected trait.  *Williams v. Palladia, Inc.*, No. 07-CV-7720 (CM), 2009 WL 362100, at *7 (S.D.N.Y. Feb. 10, 2009).  Facts

giving rise to an inference of discrimination may include "actions or remarks made by decision makers that could be viewed as reflecting a discriminatory animus, [or] preferential treatment given to employees outside of the protected class." *Id.*, at *8 (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).

Here, Fuentes has provided no evidence that the adverse action – his termination – occurred under circumstances giving rise to an inference of discrimination. He admits that neither his supervisor or manager, nor any member of Cablevision's management or human resources team ever made a negative comment, joke, or disparaging remark about his race, ethnicity, or skin color. (Def.'s 56.1 Stmt. & Responses ¶¶ 12, 22, 47.) Nor has Fuentes alleged that anyone made any derogatory comment about his gender. (*See generally* Compl.; Def.'s 56.1 Stmt. & Responses.) Thus, there is no evidence from which a reasonable jury could find that racial or gender animus was the "real reason" for his termination. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994). The only rationale provided for Fuentes' claims of discrimination is his belief that because he is African-American and Hispanic and he was terminated, he therefore was terminated because he is African-American and Hispanic. Such conjecture is insufficient to establish pretext. *See Mack v. U.S. Postal Serv.*, No. 92-CV-0068 (FB), 1998 WL 546624, at *5 (E.D.N.Y. Aug. 26, 1998) (granting summary judgment when plaintiff "merely speculate[d] that [his employer took action against him] because of his race"); *Schwartz v. York Coll.*, No. 06-CV-6754 (RRM), 2011 WL 3667740, at *7 (E.D.N.Y. Aug. 22, 2011) (granting summary judgment where allegations of pretext were "unsupported by credible, admissible evidence beyond [plaintiff's] own conjecture, speculation, and opinion").

Fuentes attempts to support his claim of discrimination by claiming that other "non-

12

Hispanic, non-African American and/or female employees" were treated more favorably in terms of Cablevision's application of its call handling policies and disciplinary actions.  (Am. Compl. ¶¶ 1, 97–124.)  He supports this claim solely through his own deposition testimony and written affirmation attesting that several other employees of various races and genders failed to make save attempts on calls but were not terminated.  (Fuentes 12/10/15 Decl. ¶ 16.)  However, Fuentes fails to support these assertions with sufficient facts.

First, Fuentes' only basis for his assertions regarding the alleged comparators is what he claims other employees told him.  (*See* Pl.'s Opp'n at 16–17 (citing only Fuentes' deposition testimony and declaration for support of statements regarding alleged comparators).)  Fuentes does not provide affidavits or deposition testimony from any of these alleged comparators. Accordingly, this testimony is inadmissible hearsay and cannot be considered on a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 269 F.3d 114, 123 (2d Cir. 2001) (upholding district court's refusal to consider anecdotal, hearsay evidence on a motion for summary judgment because "[i]t is appropriate for a district court ruling on summary judgment to consider only admissible evidence"); *H. Sand & Co. v. Airtemp. Corp.,* 934 F.2d 450, 454–55 (2d Cir. 1991) (noting that a court will not entertain inadmissible hearsay in ruling on a summary judgment motion); *Murphy v. Gen. Elec. Co.*, 245 F. Supp. 2d 459, 468 (N.D.N.Y. 2003)  (a party cannot rely on inadmissible hearsay to oppose a motion for summary judgment, absent a showing that the evidence will be available at trial) (citing *Burlington Coat Factory v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir. 1985)).

Second, even if the Court considered this hearsay evidence, Fuentes provides insufficient detail to ascertain whether these individuals were in fact similarly situated to Fuentes.  For instance, he provides minimal information about who these IRRs are, what calls they

mishandled, how frequently they mishandled calls, whether they were disciplined, whether they had similar success rates to Fuentes, and whether Cablevision had knowledge of the instances in which these individuals allegedly failed to make save attempts.  (*See* Fuentes Tr. II at 490:12–16 (indicating that Fuentes does not know if several of the IRRs he named as comparators were coached or disciplined); 493:7–11 (Fuentes stating that he does not know whether any other IRRs mishandled six calls and were not disciplined); 502:2–507:2 (Fuentes indicating that several of the alleged comparators were in tier 5, the top performance tier).)  Fuentes does testify that some of the other IRRs received disciplinary writes ups but were not terminated.  (*See* Fuentes Tr. II at 491:12–21.)  However, it is not clear when these write ups occurred, what exactly they were for, and how many times they occurred.  It is also noteworthy that Fuentes himself was previously counseled for his failure to make save attempts and was not terminated. (*See* Pl.'s Opp'n (Doc. No. 50) at 23.)  Additionally, Cablevision provides a commission sheet showing that in January 2013, all of the comparators set forth in Fuentes Declaration, (Fuentes 12/10/15 Decl. ¶ 16), that were in Jeremiah's group of IRRs were in higher tiers than Fuentes in at least two of the three listed categories.  (Retention Stats (Doc. No. 51-6) at 2.)

The information Fuentes provided is insufficient to create an inference of discrimination through comparators.  *See Desir v. Bd. of Co-op Educ. Servs.*, 803 F. Supp. 2d 168, 180 (E.D.N.Y. 2011) ("[T]o prove that the employer subjected a plaintiff to disparate treatment . . . the plaintiff must show he was similarly situated in all material respects to the individuals with whom [he] seeks to compare himself.")  "Although the ultimate burden in making a prima facie case is slight, the issue of whether fellow employees are similarly situated is somewhat strict. The other employee must have engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the

appropriate discipline for it." *Id.* (internal citations and quotation marks omitted).  At the summary judgment phase, Fuentes must present concrete facts, and he has failed to do that here. *See id.* ("Though Plaintiff generally contends that similarly situated individuals outside of his protected class were treated more favorably than he, Plaintiff has provided no detail about these employees, and thus cannot establish that they were similarly situated."); *see also Abato v. N.Y.C Off-Track Betting Corp.*, No 03-CV-5849 (LTS), 2007 WL 1659197, at *6 (S.D.N.Y. June 7, 2007) (conclusory statements that "similarly situated younger women" were treated differently, in the absence of any "specific information" concerning those individuals, were "insufficient to present a genuine issue of material fact").

Moreover, the fact that the decision to terminate Fuentes was made by individuals in the same protected class undermines any inference of discrimination.  *Mathews v. Huntington*, 499 F. Supp. 2d 258, 267 (E.D.N.Y. 2007) (collecting cases).  (*See also* Def.'s 56.1 Stmt. & Responses ¶ 2 (Fuentes is an African-American male of Hispanic descent); Checo 1/14/16 Aff. (Doc. No. 55) ¶ 1 (Checo is a Hispanic male); Jeremiah 1/14/16 Aff. ¶ 1 (Jeremiah is a black man of West Indian origin); Roman 10/30/15 Aff. (Doc. No. 47) ¶ 4 (Roman is African-American).)

Accordingly, for these reasons, Fuentes' discrimination claims based on race and gender under Section 1981 and NYSHRL fail.

b. NYCHRL

Section 8–107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived . . . race, creed, color, national origin, [or] gender . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of

employment."  N.Y.C. Admin. Code § 8–107(1)(a); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).  To prevail on a claim of discrimination pursuant to the NYCHRL, a plaintiff must show that he was treated "less well" because of a discriminatory intent.[9]  *Mihalik*, 715 F.3d at 110.

As discussed in Section I(a)(i), even under the more lenient standards of the NYCHRL, Fuentes has provided no evidence to support the assertion that he was treated less well than comparable IRRs, let alone that he was treated differently because of his race, ethnicity, or sex. Considering the "totality of the circumstance," as the Court must in considering a NYCHRL claim, *id.*, the Court finds that a reasonable jury could not find in favor of Fuentes on his NYCHRL claims.  Thus, Cablevision's motion for summary judgment with respect to Fuentes' NYCHRL claims is granted

II.    FMLA

The FMLA provides that covered employers must provide eligible employees twelve weeks of leave for various events including "the birth of a son or daughter of the employee and in order to care for such son or daughter."  29 U.S.C. § 2612(a)(1)(A).  Section 2615(a)(1) of the FMLA states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  "The regulations promulgated pursuant to the FMLA explain that [i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave, 29 C.F.R. § 825.220(b), and that [a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave."  *Potenza v. City of New York*, 365 F.3d

---

[9] "It is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims," in light of recent amendments.  *Mihalik*, 715 F.3d at 109–10 n.8.  However, the Court need not address this issue because Fuentes has failed to set forth even an initial showing of discrimination.

165, 167 (2d Cir. 2004) (quoting 29 C.F.R. § 825.220(c) (internal quotation marks omitted)).

a. Retaliation

In the context of a retaliation claim, the Court applies the *McDonnell Douglas* burden-shifting analysis. *Potenza*, 365 F.3d at 168. A plaintiff has the initial burden of establishing a *prima facie* case of retaliation, which requires a showing that: (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id.* The initial burden of establishing a *prima facie* case is minimal. *Schnabel v. Abramson*, 232 F. 3d 83, 87 (2d Cir. 2000); *Debell v. Maimonides Med. Ctr.*, No. 09-CV-3491 (SLT), 2011 WL 4710818, at *8–9 n.4 (E.D.N.Y. Sept. 30, 2011). If a plaintiff establishes a *prima facie* case, the burden then shifts to defendants to articulate "some legitimate, non-discriminatory reason" for their action. *McDonnell Douglas*, 411 U.S. at 802. Should defendant carry its burden, plaintiff must then prove by a preponderance of the evidence that defendant's legitimate reasons were not their true reasons, but were merely pretext for retaliation. *See Burdine*, 450 U.S. at 253. However, "the ultimate burden of persuading the trier of fact that defendants intentionally discriminated against the plaintiff remains at all times with plaintiff." *Id.* The Court "must use a case by case approach that evaluates the strength of plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case." *Debell*, 2011 WL 4710818, at *10 (internal citations, quotation marks, and alterations omitted).

i. Prima Facie Case

It is undisputed that Fuentes exercised rights protected under the FMLA and that he suffered an adverse employment action – termination. (Def.'s 56.1 Stmt. & Responses ¶ 17;

Pl.'s 56.1 Stmt. & Responses ¶ 22.)  Fuentes was also qualified for his position.  A plaintiff need not show good or even average performance to demonstrate that he is qualified for his position, but must merely show he "had the basic qualifications."  *Cooper v. N.Y.S. Nurses Ass'n*, 847 F. Supp. 2d 437, 448 (E.D.N.Y. 2012).  Where, as here, a plaintiff's "discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw."  *Id.* (internal citation and quotation marks omitted).

The only remaining element of the *prima facie* retaliation case then, is whether Fuentes' dismissal occurred under circumstances giving rise to an inference of retaliatory intent.  *See Potenza*, 365 F.3d at 168.  The temporal proximity of events may give rise to such an inference. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010) (finding that, in the Title VII context, "temporal proximity between [plaintiff's] complaint and his discharge . . . arguably established a prima facie case of retaliation"); *Cooper*, 847 F. Supp. 2d at 448–49 (finding plaintiff's termination less than two months after returning from FMLA leave sufficient to establish an inference of retaliatory intent for purposes of demonstrating a *prima facie* case) (collecting cases); *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 538 (S.D.N.Y. 2009) ("Temporal proximity between a plaintiff's exercise of rights created by FMLA and adverse employment action can give rise to an inference of retaliation. . . . [B]eing fired during FMLA leave is certainly enough to create a *prima facie* inference of retaliation for exercising a FMLA right."). "Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment."  *Cooper*, 847 F. Supp. 2d at 448–49 (quoting *DiCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)).

Here, Fuentes bases his allegations of FMLA retaliation on the timing of his termination. Fuentes was approved for a week of FMLA leave from January 23 through January 28, 2013.

(Def.'s 56.1 Stmt. & Responses ¶ 114.)  The temporal proximity between Fuentes' first week of

leave – ending January 28, 2013 – and the date Cablevision drafted the first termination

memorandum – January 31, 2013 – is sufficient to meet the minimal burden of establishing a

*prima facie* case.  Fuentes returned from that leave on January 30, 2013 and resumed work.  (*Id.*

¶¶ 114, 118; *see also id.* ¶ 68 (indicating that Fuentes was back at work and attending a meeting

on January 30).)  On January 31, 2013, Cablevision drafted its first termination memorandum

setting forth its reasons for termination.  (*Id.* ¶ 76.)[10]  Fuentes alleges that he requested a second

week of leave in late February, a fact that is disputed by Cablevision.  It was in this midst of this

second leave period that Fuentes was actually terminated.  (*See id.* ¶ 22.)

### ii.  Legitimate Non-Discriminatory Reasons

Cablevision has set forth what it asserts are legitimate, non-discriminatory reasons for

Fuentes' termination – namely Fuentes' poor performance going back to 2012, and his alleged

failure to comply with Cablevision's call handling policy during the six calls in January 2013.

A contemporaneous timeline referred to as a BOSS timeline shows that Fuentes had several

performance problems throughout his employment at Cablevision.[11]  (*See* Hoey Decl., Ex. Q

("BOSS Timeline") (Doc. No. 46-17) at 4–8 ("Fuentes was coached on January 19, 2012, as he

did not meet the minimum performance standards as required by the Department"; "I therefore

warned [Fuentes] that continued unsatisfactory performance related issues, or violations of

Company policy or procedure will result in further disciplinary action, up to and including

termination of his employment with Cablevision"; "Pedro told Victor that he needs to be more

---

[10] Fuentes does not dispute that the initial draft of the termination memo was prepared on January 31, 2013.  (*Id.* ¶ 76.)

[11] While Fuentes disputes the conclusion that the timeline reflects a "documented history of performance problems during his employment," he does not contest the accuracy of the content of the BOSS Timeline.  (Def.'s 56.1 Stmt. & Responses ¶ 42.)

aggressive and make stronger attempts on every call.  Victor is currently aware that he has no

RGU sales for the month, the two sales that he had were canceled."; "Reminded rep to use[ ]

professional tone at all time[s].  Some points in the call he seemed to be goading the customer

who was irate."; "Below dept avg in all areas of concern."; "Explain that any performance

resulting in 1st tier would result in corrective action."; "Below dept avg for both resi and comm

rev.  Low RGU."; "Reminded rep he has to meet dept avg in all areas for performance to avoid

corrective actions").)  In January 2013, Fuentes had a particularly poor performance month,

including the six allegedly mishandled calls.  (Def.'s 56.1 Stmt. & Responses ¶ 70.)

These documented performance issues support Cablevision's proffered reasoning for

terminating Fuentes – "unsatisfactory sales performance and failure to comply with department

policy."  (Def.'s 56.1 Stmt. & Responses ¶ 76; 1/31/13 Termination Request at 2.)  Based on the

foregoing, Cablevision has established a legitimate, non-discriminatory reason for Fuentes'

termination.  *See Town of Huntington*, 2008 WL 361136, at *7 (finding that "poor job

performance constitutes a legitimate, nondiscriminatory reason" for employee termination).

### iii.   Pretext

Fuentes argues that Cablevision's stated reasons for his termination are mere pretext for

retaliatory animus based on his FMLA leave.  "While temporal proximity can support a prima

facie showing of discrimination, something more is required to show evidence of discriminatory

intent once defendants have articulated a legitimate reason for the adverse action."  *Jain v.

McGraw-Hill Cos.*, 827 F. Supp. 2d 272, 278 (S.D.N.Y. 2011).  Here, in addition to the temporal

proximity of the January 31, 2013 draft termination memorandum and the timing of his ultimate

termination to Fuentes' week of FMLA leave, there are additional circumstances that give rise to

an actionable claim for FMLA retaliation.

20

First, Roman testified that, when discussing with Fuentes Cablevision's reasons for terminating him, she informed him that it "was predominantly about the calls," but she also discussed "his possible job abandonment." (Roman Tr. II at 71:8–17). This testimony links Fuentes' FMLA leave with his termination. Moreover, the parties dispute the material fact of whether Fuentes gave notice of his second week of FMLA leave and, accordingly, whether Fuentes was terminated because he requested a second week of FMLA leave, and/or whether Fuentes was properly granted and actually away on FMLA leave at the time Cablevision called him back into the office and terminated him. (Pl.'s 56.1 Stmt. & Responses ¶ 12.)

Second, Fuentes was previously counseled by his prior supervisor for failure to make save attempts and was not terminated. (Def.'s 56.1 Stmt. & Response ¶ 43.) Cablevision argues that his termination in January 2013 was the result of a policy of progressive discipline at the company. (Checo Tr. II at 102:10–23; Roman 29:9–13). While that may be true, there are other concerns raised by the evidence and discussed below from which a reasonable jury may find that Fuentes' termination was improperly motivated by his FMLA leave.

Jeremiah, testified that, at the request of Checo, he reviewed Fuentes' calls in January 2013. (Jeremiah Tr. II (Doc. No. 52-4) at 64:10–73:5; *see also* 1/31/13 Termination Request (indicating that the calls in question occurred in mid-to-late January 2013).) He further testified that there was no system in place dictating which IRR's calls a supervisor would listen to, as it was at the supervisor's discretion. (*Id.* 63:23–25.) This raises questions as to why, following the birth of Fuentes' child and on the eve of his FMLA leave, this decision was made. Additionally, the January 30, 2013 meeting in which Jeremiah discussed the calls with Fuentes was not listed on the contemporaneous BOSS timeline, despite the fact that it was described by Jeremiah as a "very important meeting." (Jeremiah Tr. II at 114:20–116:13.) And finally, while Checo denied

knowledge that Fuentes was on FMLA leave, the record shows that he received an e-mailed spreadsheet informing him of who was on such leave and, in fact, forwarded that e-mail on January 29, 2013, to other Cablevision employees noting that they should be sure to review the information.  (Checo Tr. II at 180:23–181:17, 184:4–185:17; Checo 1/29/13 Email Re FMLA Leave (Doc. No. 52-1) at 2.)

Fuentes strongly disputes that there was a policy in effect that required him to make save attempts, and further claims that he did not "mishandle" the six calls that served as the basis for his termination.[12]  Cablevision correctly argues that "[s]imply disputing the basis for disciplinary action does not fulfill plaintiff's burden. … The ultimate [issue is] whether considerations of [discrimination] played a role in the employer's decision, not with the wisdom of the employer's disciplinary determinations."  *Hayes v. Cablevision Sys. N.Y.C. Corp.*, No. 07-CV-2438 (RRM), 2012 WL 1106850, at *36–37, 45 (E.D.N.Y. Mar. 31, 2012).  However, "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.  *Reeves*, 530 U.S. at 148.

Here, Fuentes has raised facts and circumstances that go beyond merely challenging the basis for his termination.  All of the circumstances discussed herein, taken together, color the

---

[12] Fuentes points to Cablevision's Compensation Policy and Procedures to support his claim that save attempts should be made when a current customer is seeking to downgrade or disconnect her service, but not when a former customer who has already disconnected and is seeking information on how to return equipment or otherwise finalize the cancellation of their service, calls.  (See e.g., Fuentes 12/10/15 Decl., ¶¶ 8, 14–15, and Ex. B; see also Checo Tr. II (Doc. No. 52-3) at 21:3–20.) Fuentes testified that four of the six calls in question were such calls. (Def.'s 56.1 Stmt. & Responses ¶¶ 74; 176–79; Fuentes 12/10/15 Decl. ¶ 14.)   Fuentes also asserts that he did in fact make a save attempt on one of the other two calls by asking the customer why he chose to stop service and asking the customer about the customer's satisfaction with the price of service before twice being told by the caller that his parents made the decision and the caller had no say in whether service could continue.  (Fuentes 12/10/15 Decl. ¶ 15.)  On the other hand, Cablevision asserts that IRRs were required to make save attempts on every call pursuant to its Customer Care Policies, which states that IRRs "must make save attempts on every call" and "[a]ttempts to up-sale should be made on all calls."  (Customer Care Policies at 2.)  Cablevision employees testified to that fact, adding that the Compensation Policy is merely a contractual provision that determines when IRR's will get paid for successful saves..

reasons proffered by Cablevision for Fuentes' termination, particularly when juxtaposed with the timing of Cablevisions actions and Fuentes' FMLA leave. *See Benimovich v. Fieldston Operating LLC,* No. 11-CV-780 (RA), 2013 WL 1189480, at *6 (S.D.N.Y. Mar. 22, 2013) (finding sufficient questions of fact to establish pretext for purposes of summary judgment where termination occurred during FMLA leave and plaintiff provided facts that called into question defendants' reasons for termination); *see also Terry v. Cnty. Of Cayuga*, No. 11-cV-1296 (LEK), 2013 WL 5464395, at *8–9 (N.D.N.Y. Sept. 30, 2013) (finding that where an employer alleged termination was based in part on excessive phone use and there was some evidence that phone use was not in fact excessive, a reasonable jury could find the alleged reason for termination was pretextual). For all of these reasons, there are sufficient factual issues related to Fuentes' FMLA retaliation claim that preclude granting summary judgment in favor of Cablevision.

b. Interference

The FMLA also prohibits employers from interfering with their employees' ability to take FMLA leave. *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA].") To establish an interference claim pursuant to 29 U.S.C. § 2615(a)(1), a plaintiff need only prove that an "employer in some manner impeded the employee's exercise of [his or her] right[s]" protected by the FMLA. *Zahler v. Empire Merchants*, *LLC*, No. 11-CV-3163 (JG), 2012 WL 273698, at *8 (E.D.N.Y. Jan. 31, 2012) (quoting *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 176 (2d Cir.2006)). The employer's intent is irrelevant to an FMLA interference claim. *Id.*

To establish a *prima facie* claim of interference under the FMLA, a plaintiff must establish by a preponderance of the evidence that: (1) he is an eligible employee under the

23

FMLA; (2) defendants constitute an employer under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave notice to defendants of his intention to take leave; and (5) defendants denied his benefits to which he was entitled by the FMLA."[13]  *Esser v. Rainbow Advertising Sales Corp.,* 448 F. Supp. 2d 574, 580 (S.D.N.Y. 2006) (collecting cases). "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Zahler*, 2012 WL 273698, at *8 (quoting 29 C.F.R. § 825.220(b) (internal quotation marks omitted)).

Here, Fuentes bases his interference claim on his assertion that he was terminated on March 6, 2013, and, prior to his termination, while he was on his second week of FMLA leave, Cablevision threatened him with job abandonment and informed him that he had to come into work during his alleged leave.  (Pl.'s Opp'n at 25; Pl.'s 56.1 Stmt. & Responses ¶¶ 16, 20.)  Such a claim, if true, would defeat a motion for summary judgment.  *See Avila-Blum v. Casa de Cambio Delgado, Inc.*, 519 F. Supp. 2d 423, 428 (S.D.N.Y. 2007) (finding a material dispute of fact with respect to an FMLA interference claim where plaintiff alleged and defendant denied that plaintiff's employer told her she would be fired if she took FMLA leave); *see also Nixon v. Silverado Hospice of Houston*, No. 12-CV-985 (NFA), 2013 WL 3973980, at *4–5 (S.D. Tx. July 31, 2013) (finding that an interference claim under the FMLA survived a motion for summary judgment where plaintiff testified that she felt pressured to return early from FMLA leave).

Thus, summary judgment is not appropriate for either party with respect to Fuentes' FMLA interference claim.  *See Debell*, 2011 WL 4710818, at *7–8 (denying motion for

---

[13] The parties do not dispute that Fuentes was an eligible employee under the FMLA, that defendants constitute an employer under the FMLA, or that Fuentes was entitled to leave under the FMLA.  (Pl.'s 56.1 Stmt. & Response (Doc. No. 63) ¶¶ 1, 3, 9.)

summary judgment with respect to an FMLA interference claim where plaintiff raised a genuine issue of material fact as to whether defendant was on notice of plaintiff's need for FMLA leave).

**CONCLUSION**

For the reasons set forth above, Cablevisions motion for summary judgment is granted with respect to Fuentes' discrimination claims under Section 1981, the NYSHRL and the NYCHRL.  Cablevision's motion for summary judgment is denied with respect to Fuentes' FMLA claims for retaliation and interference.  Fuentes' motion for partial summary judgment with respect to his FMLA interference claim is denied.

This matter is recommitted to Magistrate Judge Pollak for continued pretrial supervision, including further discovery and any settlement discussions, and the preparation of a Joint Pre-Trial Order.

SO ORDERED.

Dated: Brooklyn, New York
      September   19, 2016

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge